[Crim. No. 3152. Fourth Dist., Div. Two. Aug. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID KRANHOUSE, Defendant and Appellant.

441

Richard J. Weller for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark W. Jordan, Deputy Attorney General, for Plaintiff and Respondent.

KERRIGAN, J.—Indicted for grand theft (Pen. Code, § 484) and for assault by means of force likely to produce great bodily injury (Pen. Code, § 245), defendant entered a plea of not guilty as to each count, waived a jury trial, waived his right to the assistance of counsel, and proceeded to trial in propria persona. He was found guilty of both charges and moved for a new trial. At the time of the hearing on the motion for new trial, defendant was represented by counsel, but the motion was denied. Pronouncement of judgment was withheld, and defendant was granted probation for a period of three years on the greater offense of assault. Sentence on the grand theft count was stayed for the probationary period, and was ordered permanently stayed in the event the defendant successfully completed the term of probation.

This appeal is from the order granting probation. The appeal is entirely proper inasmuch as an order granting pro-

bation must be deemed to be the final judgment for the purpose of appeal where pronouncement of judgment is withheld. (Pen. Code, § 1237, subd. 1; *People* v. *Goldstein,* 136 Cal.App. 2d 778, 793 [289 P.2d 581]; *People* v. *Camargo,* 130 Cal.App. 2d 543, 544-545 [279 P.2d 194].)

In March 1966 defendant owned and operated a real estate brokerage firm in Desert Hot Springs. He was also a certified public accountant and did some tax work in connection with his real estate business. The victim, Bernard Berkey, lived with his wife, Mildred Berkey, in the Palm Springs area. He apparently retired as a result of a physical disability, although he occasionally engaged in security transactions involving the purchase and sale of first trust deeds.

Defendant and the victim became acquainted when the victim's wife, in March 1966, won a Hotel Hacienda "Champagne Package Trip" to Las Vegas as the result of a promotional venture sponsored by defendant's real estate firm. When she was notified that she had won the "jack-pot" trip for two to the gambling mecca, she was originally advised that arrangements might be made whereby she and her husband could travel from Palm Springs to Las Vegas by air. Defendant later ascertained that a champagne flight was not available from the Palm Springs terminal, and suggested that he drive the winners to Las Vegas after his tax work was completed on April 15. The proposal was entirely agreeable to the Berkeys.

On April 27, the Berkeys and defendant drove to Las Vegas in defendant's car. Before departing, the Berkeys left their car in defendant's garage in Desert Hot Springs. The Berkeys had a large suitcase and a small suitcase, together with some incidental clothing on hangers. They arrived in Las Vegas in the early afternoon and checked into the Hacienda Hotel. Defendant had arranged to meet a lady friend from Los Angeles at the Las Vegas airport, and in the evening, the four decided to attend the "Hello Dolly" show at the Hotel Riviera. The bill for four persons amounted to $42, and defendant paid the check. Later the Berkeys treated defendant and his girl friend to a midnight supper at another restaurant.

On April 29 the defendant and Berkeys left Las Vegas in defendant's car. Apparently the defendant's female companion had previously returned to Los Angeles by plane. The evidence is conflicting as to the relationship between the three principals on the return trip. Defendant maintains that the Berkeys were upset because they wanted to arrive in the

early evening inasmuch as they were expecting house guests. However, he had been unable to leave early because he had an appraisal to make in the Las Vegas area for a client. When they arrived at defendant's residence around 9 p.m., Bernard Berkey took his clothes and the Berkeys' small suitcase to his car, and defendant took the Berkeys' large suitcase and placed it in the rear seat of their car. After the Berkeys were positioned in their vehicle, they noticed that defendant's car blocked the garage exit so that Berkey could not back up for the purpose of reaching the street.

Defendant then appeared on the passenger side of Berkeys' car and demanded one-half of the price of the ''Hello Dolly'' dinner show. Words were exchanged between the two men as to whether Berkey should contribute, and Berkey refused to pay until he had had an opportunity to check to determine whether he was in any way responsible for the Hotel Riviera dinner show, or whether it was included in the champagne tour which Mrs. Berkey had won. In any event, defendant reached into the car and grabbed the large valise. Berkey got out of his car and demanded the return of his suitcase, and when defendant refused the request, Berkey removed a make-up kit out from defendant's car. Berkey offered to exchange the kit for the valise, but the defendant refused. Thereafter, a fistfight ensued between the defendant and Berkey. The evidence is again conflicting as to who struck the first blow. After the initial flurry of punches, Berkey retreated with his valise. Defendant chased him, jumped on him, and knocked him to the ground. While he was on the pavement, defendant pounced on Berkey and banged his head on the pavement. Mrs. Berkey tried to pull the defendant away, hit him with her purse, and screamed that her husband was a sick man. When defendant ceased beating the victim, and while Berkey was looking for his glasses, defendant grabbed at Berkey's pants pocket and ripped it. When the victim went across the street to phone the police, defendant picked up the large suitcase, put it in his car, left his home, and went to a friend's house. The suitcase was not returned until some three weeks later. Its contents were valued in the sum of $300-$400. Upon its return, certain personal papers and effects were missing. Defendant admitted removing the papers and further admitted that he would not have returned the suitcase except that his counsel advised him to do so.

The record reflects that Berkey sustained serious injuries in the attack. He was examined and treated by a local physician

immediately following the assault, and the doctor indicated that he had suffered a fracture of the right scapula [shoulder blade], a sprained right shoulder, and contusions, bruises and abrasions of the arms and head. The physician further indicated that considerable force in the form of a direct blow would have to be administered in order to fracture the scapula.

Defendant raises the following issues on appeal: (1) He did not effectively waive his right to counsel; (2) he did not effectively waive his right to a jury trial; (3) insufficiency of the evidence to support the grand theft conviction; (4) insufficiency of the evidence to support the serious assault conviction; and (5) the trial court erred in conducting an experiment.

Initially, defendant maintains that he did not effectively waive his right to counsel inasmuch as the court did not conduct a full inquiry for the purpose of determining whether he understood the significance and import of waiving counsel in a trial involving two serious felony charges. While the record is not clear as to the exact advisements furnished the defendant by the court at the time of his arraignment in November 1966, the check list, or form sheet, reflects that the court advised defendant "as to his legal rights," and that the defendant "through counsel, waived the reading of the indictment" and also waived jury trial. However, when defendant appeared for trial in superior court in January 1967, the judge advised him that he was entitled to an attorney, and that if he could not afford one, the court would appoint one to represent him. The defendant replied that he ". . . clearly understood." The court then inquired that notwithstanding the fact that he had been previously advised of his right to counsel ". . . and that you are now advised, you do, freely and voluntarily, waive the right to have an attorney, is that correct?" The defendant replied, "Yes, Your Honor." The trial then proceeded before the court without a jury with the defendant acting as his own counsel.

The record further indicates that after the trial court found the defendant guilty of both charges, the defendant filed a "declaration" in support of his motion for new trial. In the declaration, he affirmed that the decision to represent himself rested entirely with him; that the court made inquiries as to whether he desired counsel be appointed, and that he insisted in proceeding in propria persona, notwithstanding that the court instructed him as to the serious nature of the charges;

that it was his belief that it was not necessary to have counsel, and he waived counsel because he believed he was innocent and ". . . would not dignify [the trial] . . . with counsel or take up the court's time with a lengthy jury trial" inasmuch as he did not contemplate the possibility of being found guilty; that he never imagined for one moment the consequences and penalties that would arise from an adjudication of guilt.

A defendant not only has the right to counsel, but also the right to represent himself, and generally, the court cannot force a mentally competent defendant to be represented by an attorney. (Cal. Const., art. I, § 13; *People* v. *Crovedi*, 65 Cal.2d 199, 207-208 [53 Cal.Rptr. 284, 417 P.2d 868]; *People* v. *Mattson*, 51 Cal.2d 777, 788-789 [336 P.2d 937].) However, the court cannot accept a waiver of counsel from anyone accused of a serious public offense without first determining that he understands the nature of the charge, the elements of the offense, the pleas and defenses which may be available, or the punishments which may be exacted. (*In re James*, 38 Cal.2d 302, 313 [240 P.2d 596]; *People* v. *Chesser*, 29 Cal.2d 815, 822 [178 P.2d 761, 170 A.L.R. 246].)

The determination of whether defendant intelligently waived his right to counsel depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. (*Johnson* v. *Zerbst*, 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *In re Johnson*, 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420].) On appeal, the defendant has the burden of establishing that he did not competently and intelligently waive this right. (*Moore* v. *Michigan*, 355 U.S. 155, 161-162 [2 L.Ed.2d 167, 172-173, 78 S.Ct. 191]; *People* v. *Santos*, 245 Cal.App.2d 337, 340 [53 Cal.Rptr. 859].) From the present record, it is obvious that the defendant, *before* he waived counsel, was not properly advised as to the nature of the charge, the elements of the offense, the pleas or defenses which might be available, or the punishments which could be imposed or exacted. (*In re James, supra,* 38 Cal.2d 302, 313; *People* v. *Cummings*, 255 Cal.App.2d 341, 346 [62 Cal.Rptr. 859].)

Nevertheless, an examination of the entire record demonstrates that while defendant was not sufficiently apprised of his rights before he waived counsel, he was again offered counsel at the time he appeared for trial in the superior court but refused the assistance of an attorney. Defendant, himself,

in moving for a new trial, indicated that the decision to represent himself rested entirely with him, and conceded that the court had instructed him as to the serious nature of the charges. Defendant capably represented himself during trial, probably as ably as any layman could. He made an opening statement. He claimed that he acted solely in self defense. His cross-examination of the victim's doctor reflected a familiarity with medico-legal concepts and terms. He cross-examined the prosecution witnesses, including the victim, extensively for the purpose of attacking their credibility. His cross-examination of the victim comprises some 100 pages of transcript. He utilized the transcript of the grand jury proceeding in his cross-examination. He claimed that he only held the suitcase as security for repayment of the ''Hello Dolly'' dinner show bill. He offered documentary evidence, and it was received. He moved for a dismissal of the prosecution's case when the People rested. Finally, he made an intelligent closing argument, referring both to the facts presented and the law involved. Moreover, he moved for a new trial and filed a declaration with the court which he executed in propria persona.

Defendant testified that he was a certified public accountant, prepared income tax returns, and was a licensed real estate broker. Certainly a professional man of his background and experience was well-aware that punishment flows from crimes of such a serious nature. From the manner in which he conducted the trial in his own behalf, and the statements contained in his declaration in support of his motion for new trial, it is evident that the defendant was well-aware of the nature of the proceedings in which he was involved, and ''that he was as capable as any layman is likely to be of representing himself.'' *People* v. *Mason,* 259 Cal.App.2d 30, 36 [66 Cal.Rptr. 601].) The error in the trial forum of not conducting a full inquiry at arraignment, or before the trial commenced, was not prejudicial inasmuch as it conclusively appears that the waiver of counsel was freely and intelligently made. (*People* v. *Mason, supra*; *People* v. *Santos, supra,* 245 Cal.App.2d 337, 340.)

 Defendant next contends that there was no effective waiver of the right to trial by jury. While the record presumes to show that defendant, through counsel, waived a jury trial, the record is obviously in error inasmuch as the defendant appeared at arraignment without counsel. The record is also silent as to what was explained to the defendant regarding his right to a jury trial inasmuch as the check list, or

form entry, only indicates that the defendant waived jury trial. Defendant further maintains that an accused who represents himself is constitutionally incapable of waiving a jury trial. However, in his ''declaration'' in support of his motion for new trial, the defendant stated that he did not want to take up the court's time with a jury trial. ■ While it is fundamental that a defendant in any serious criminal case is entitled to a trial by jury, he may waive the right of jury trial, providing he consents thereto, his counsel concurs, and the prosecution also consents. (Cal. Const., art. I, § 7.) Waiver of jury trial requires an affirmative showing of an *express,* as distinguished from *implied,* waiver by the defendant in open court. (*In re Adams,* 160 Cal.App.2d 454, 455 [325 P.2d 107]; Witkin, Cal. Criminal Procedure (1963) § 344, p. 327.)

■ Notwithstanding the efficacy of the foregoing principles, no stereotyped language expressing a waiver need be used; all that is necessary is that the language used shows an intention to submit the case to the court without a jury. (*People* v. *Bastio,* 55 Cal.App.2d 615, 618 [131 P.2d 614]; *People* v. *DiBlasi,* 198 Cal.App.2d 215, 223 [18 Cal.Rptr. 223].) If the record indicates that a defendant and his counsel waive jury trial, such a record is sufficient to establish waiver. (*People* v. *Brown,* 214 Cal.App.2d 128, 130-131 [29 Cal.Rptr. 267].)

■ The record indicates that the defendant personally and knowingly waived jury trial. ■ Moreover, an unrepresented defendant who proceeds to trial in propria persona is deemed to be his own counsel for the purpose of trial, and therefore is fully capable of waiving his right to a jury trial. (*People* v. *Rumsey,* 127 Cal.App. 272, 273-274 [15 P.2d 780].)

■ Defendant also maintains that the evidence is insufficient to support his conviction of grand theft inasmuch as he did not have the specific intent to permanently deprive the owner of the suitcase since he had a ''good faith'' belief that he was entitled to the property as a lien for the amount the victim owed him from the dinner show. Obviously, the question of whether defendant possessed the necessary intent to deprive the victim of the suitcase permanently was a factual issue. ■ Whether an act is performed with any particular specific intent is a question of fact for the trier-of-fact, and where there is any substantial evidence to support the trier's finding on such issue, the finding will not be disturbed on appeal. (*People* v. *Lyles,* 156 Cal.App.2d 482, 486 [319 P.2d 745]; *People* v. *Moulton,* 71 Cal.App.2d 195, 197 [162 P.2d 317].)

In *People* v. *Moulton, supra,* the facts were similar to those under review. The defendant, who was convicted of robbery in the second degree, contended that the victim owed him $2 for transportation of the victim and two girls in the defendant's automobile, that he took no more than that amount from the victim, and that no *animus furandi* [intent to steal] was shown. The evidence reflected that when the defendant demanded payment of $2, the victim inquired why he owed that sum. The defendant knocked the victim down, kicked him, and searched his pockets. He removed the victim's billfold, took out $9, and threw the billfold on the ground. The reviewing court held that the defendant's contentions raised questions of fact for the jury's determination, and that its implied finding adverse to the defendant would not be disturbed since there was substantial evidentiary support therefor.

Similarly, in the case under review, there is credible evidence that defendant took the property with the intent to deprive the Berkeys of its permanent possession. When the victim requested the return of the suitcase, defendant assaulted him, took the suitcase, put it in his car, left the scene, and did not return that evening, but remained overnight at a friend's house. Defendant testified that he would not have returned the suitcase except for the advice of his attorney. Further evidence of his wrongful intent is inferrable from the fact that he opened the suitcase and took some papers and personal effects belonging to the owners out of the suitcase and kept them. The fact that the property, or some of it, was returned is no defense to the charge of grand theft. (*People* v. *Pond,* 44 Cal.2d 665, 674 [284 P.2d 793].)

Defendant's argument that he possessed a ''good faith'' belief that he was entitled to distrain the victim's personal property for payment of a debt lacks credibility in light of the fact that he resorted to such excessive force in gaining possession of the property taken. (See *Henderson* v. *State,* 149 Tex. Crim. Rep. 167 [192 S.W.2d 446, 447].) He resorted to the ''law of the jungle'' in endeavoring to settle the dispute with the victim.

There is likewise substantial evidence of defendant's guilt of the serious assault charge. While the issue of self-defense presented a question of fact for the trial judge (*People* v. *Duchon,* 165 Cal.App.2d 690, 694 [332 P.2d 373]; *People* v. *Castro,* 162 Cal.App.2d 177, 181 [327 P.2d 596]), the evidence was conclusive that defendant was the aggressor,

not the victim. After defendant took the suitcase and started towards his car, the victim followed in an unsuccessful effort to recover his valise. Defendant would not relinquish it, so the victim poked his car keys in defendant's hand and succeeded in making the defendant drop it. The victim grabbed the suitcase and started towards his car. He was tackled from the rear by the defendant, who came down with his full weight on the victim's shoulder, presumably fracturing the scapula at that moment. The defendant repeatedly banged the victim's head against the pavement. The victim suffered a fractured shoulder blade, a sprained shoulder, contusions, bruises and abrasions of the head and other important members of the body.

Where the right of self-defense exists, it must be gauged by the defendant's belief that he was in actual peril, and that as a reasonable person, he had sufficient ground for his belief. (*People* v. *Duchon, supra,* 165 Cal.App.2d 690, 693; 14 Cal.Jur.2d, § 226, p. 471.) Here the defendant's conduct, after being jabbed with the keys, was so unreasonable that it went well beyond the realm of self-defense. The force which he applied to the victim was grossly excessive, and the trial court was justified in rejecting the defense of self-defense.

In conclusion, defendant maintains that a demonstration conducted by the court at the defendant's request after both sides had completed the testimonial phase of their case was improper. Defendant requested that the court view the Berkey car and conduct an experiment for the purpose of determining whether the large suitcase could be removed from the car with the Berkeys sitting in the front seat. The Berkeys sat in the front seat of the vehicle, and the prosecutor apparently reached in and removed the suitcase. Defendant maintains that the conditions existing at the time of the demonstration were not identical with those that prevailed at the scene on the date the offenses were committed. However, it is impossible to tell from the record whether the conditions were, or were not, the same. The only differences in conditions claimed by the defendant was to the effect that the front seat had been moved forward 6 inches from the position it occupied on the night in question. However, he called the difference in the seat's position to the court's attention at the time the demonstration was being conducted. His claim that the prosecutor should not have been allowed to participate as an actor is not supported by any authority. In any event, it is

extremely doubtful that the experiment had any probative value, and it is likewise questionable whether the demonstration had any effect on the trial court's ultimate determination. The use of an experiment rests within the sound discretion of the trial judge. (*People* v. *King*, 104 Cal.App.2d 298, 307 [231 P.2d 156].) Moreover, the defendant requested the test, and he has cited no authority reflecting that the trial court abused its discretion in conducting the experiment.

Judgment affirmed.

McCabe, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied September 25, 1968.